IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JASON McGEHEE, et al., §
§
Plaintiffs, §
§
v. § MISCELLANEOUS NO. H-18-1546
§
TEXAS DEPARTMENT OF CRIMINAL §
JUSTICE, §
§
Defendant. §

## <u>MEMORANDUM OPINION AND ORDER</u>

This case arises from litigation filed by Arkansas death row inmates ("Plaintiffs") in the United States District Court for the Eastern District of Arkansas challenging that State's lethal injection protocol. None of the inmates currently face an execution date. Plaintiffs' complaint in the Arkansas case argues that the State's lethal injection protocol violates the Eighth Amendment's prohibition against Cruel and Unusual Punishment.[1]

Arkansas state law provides for two alternative methods of lethal injection: the use of (1) "a barbiturate" or (2) a three-drug process of "Midazolam, followed by vecuronium bromide, followed by potassium chloride." ARK. CODE ANN. § 5-4-617(c). Arkansas' current lethal injection protocol employs the statutorily endorsed three-drug cocktail. Litigation in several jurisdictions including Arkansas has challenged the use of midazolam, which is a

---

[1] <u>McGehee v. Hutchinson</u>, 4:17-cv-00179-KGB (E.D. Ark.).

benzodiazepine sedative.[2] The Arkansas lawsuit, in part, seeks to show that pentobarbital – the substance used in Texas' lethal injection process – is a feasible, readily available alternative to midazolam.

In conjunction with the Arkansas lawsuit, on February 22, 2018, Plaintiffs filed a subpoena *duces tecum* on the defendant Texas Department of Criminal Justice ("TDCJ") seeking disclosure of information relating to Texas' execution protocol, including the identity of the current supplier of the compounded pentobarbital Texas uses in executions. In response, Texas disclosed some information, but did not reveal key details about the source of its execution drugs, including the supplier's identity.

Plaintiffs initiated the instant lawsuit by filing a Motion to Compel Compliance with Subpoena.[3] TDCJ has responded by submitting a Dispositive Motion to Dismiss Plaintiffs' Motion to Compel Compliance with Subpoena.[4] Plaintiffs have filed an answering

---

[2]See Grayson v. Warden, Commissioner, Alabama Doc, 869 F.3d 1204, 1210-11 (11th Cir. 2017) (describing use of, and concerns about, the use of midazolam in executions).

[3]Plaintiffs' Motion to Compel Compliance with Subpoena ("Motion to Compel"), Docket Entry No. 1.

[4]Texas Department of Criminal Justice's Dispositive Motion to Dismiss Plaintiffs' Motion to Compel Compliance with Subpoena ("Motion to Dismiss"), Docket Entry No. 12. Plaintiffs argue that the motion to dismiss is an "unorthodox (and not necessarily proper) procedural move," but do not seek dismissal of the motion on that basis. See Plaintiffs' Answering Brief in Opposition to the "Texas Department of Criminal Justice's Dispositive Motion to Dismiss Plaintiffs' Motion to Compel Compliance with Subpoena"
(continued...)

brief,[5] to which TDCJ has filed a reply.[6] Plaintiffs have requested oral argument, but the parties' papers provide a sufficient basis for a full and fair adjudication of the issues before the court. After considering the facts, the record, and the applicable law, the court will quash the subpoena issued by Plaintiffs.

## I. Background

Adjudicating the matters now before the court requires reviewing the nationwide history of Eighth Amendment challenges to a state's method of execution, the national efforts by advocacy groups and inmates to curtail the use of lethal injection, and the response by the states as suppliers for lethal injection chemicals have dwindled. The court will then turn to the developments in Arkansas that have led to this action.

### A. Developments in Eighth Amendment Law

Throughout American history, several methods have been used to carry out an inmate's death sentence. By the beginning of this century, every jurisdiction that imposes the death penalty had established lethal injection as a method, if not the only method,

---

[4](...continued)
("Answering Brief"), Docket Entry No. 14. The court will consider the Motion to Dismiss as an opposition to the Motion to Compel.

[5]See Answering Brief, Docket Entry No. 14.

[6]See Texas Department of Criminal Justice's Reply to Plaintiffs' Answering Brief in Opposition ("Reply to Answering Brief"), Docket Entry No. 15.

of execution.[7] Lawsuits across the country have since challenged various aspects of the lethal injection process.

Even though the Supreme Court has "never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment," inmates began challenging the use of lethal injection under the Eighth Amendment. Glossip v. Gross, 135 S. Ct. 2726, 2732 (2015) (quotation omitted). In Baze v. Rees, 128 S. Ct. 1520 (2008), the Supreme Court "cleared any legal obstacle to use of the most common three-drug protocol that had enabled States to carry out the death penalty in a quick and painless fashion," Glossip, 135 S. Ct. at 2733. In doing so, the Baze Court created a two-part test for evaluating a lethal injection challenge.

Under Baze the condemned inmate must first "establish[] that the State's lethal injection protocol creates a demonstrated risk of severe pain," which requires an inmate to show a "substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." Baze, 128 S. Ct. at 1531 (quotation omitted). Inmates must then propose a

_____

[7]In 1983 the Arkansas Legislature removed electrocution and adopted lethal injection as the primary method of execution. By 2008 most jurisdictions used a protocol calling for the sequential administration of three drugs: a fast-acting barbiturate such as sodium thiopental, a paralytic agent such as pancuronium bromide, and a drug such as potassium chloride that induces cardiac arrest.

"feasible, readily implemented [alternative procedure that will] in fact significantly reduce a substantial risk of severe pain[.]" Baze, 128 S. Ct. at 1532.

In 2009 several states, including Texas, changed their execution protocols from a three-drug protocol to a one-drug injection of pentobarbital. "Pentobarbital is an intermediate-acting barbiturate. . . . Two gram doses of pentobarbital are fatal, the five gram doses that Texas uses are overwhelmingly so." Whitaker v. Livingston, 2016 WL 3199532, at *1 (S.D. Tex. 2016).[8]

"[P]entobarbital was used in all of the 43 executions carried out in 2012." Glossip, 135 S. Ct. at 2733. "[A] practical obstacle soon emerged" to the use of pentobarbital "as anti-death-penalty advocates pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences." Glossip, 135 S. Ct. at 2733. In response to the shift toward pentobarbital, "[a]nti-death-penalty advocates lobbied the Danish manufacturer of the drug to stop selling it for use in executions. That manufacturer opposed the death penalty and took steps to block

_____

[8]Arkansas amended its statute in 2009 to authorize the use of various substances, but did not specify that pentobarbital was a potential substance for use in executions. The Arkansas statute stated that the State could use "one or more ultra-short-acting barbiturates" and "one or more chemical paralytic agents," ARK. CODE ANN. § 5-4-617 (2009) (amended 2013). Testimony in other cases has established that pentobarbital is "not classified as an 'ultra short-acting barbiturate.'" Mann v. Palmer, 713 F.3d 1306, 1313 (11th Cir. 2013). Arkansas later amended its statute to allow the use of "a barbiturate," which would presumably include pentobarbital.

the shipment of pentobarbital for use in executions in the United States." <u>Glossip</u>, 135 S. Ct. at 2733 (citations omitted).

States have taken two approaches to losing suppliers of manufactured pentobarbital. First, States like Texas have acquired pentobarbital from compounding pharmacies that have attempted to keep their identity secret.[9] Other states, like Arkansas, "have turned to midazolam, a sedative in the benzodiazepine family of drugs." <u>Glossip</u>, 135 S. Ct. at 2734. In 2015 Arkansas amended its method-of-execution statute to authorize the use of midazolam as part of a three-drug protocol. Since <u>Glossip</u>, there have been at least twenty executions carried out in Florida, Alabama, Virginia, Ohio, Tennessee, and Arkansas using midazolam.[10]

Inmates have repeatedly challenged midazolam as an agent that is capable of causing a botched execution. In <u>Glossip v. Gross</u>, 135 S. Ct. 2726 (2015), inmates argued that Oklahoma's three-drug

---

[9]In 2013 a loss of suppliers forced Texas to use compounded pentobarbital instead of manufactured pentobarbital. "Compounding pentobarbital involves dissolving an active ingredient — pentobarbital sodium salt powder — in a water-solvent solution. The mixture is processed into a liquid that can be injected." <u>Whitaker</u>, 2016 WL 3199532, at *1. The Fifth Circuit has applied the <u>Glossip</u> standard to conclude that the use of compounded pentobarbital does not subject an inmate to a substantial risk of severe pain. <u>See</u> <u>Whitaker v. Collier</u>, 862 F.3d 490, 499 (5th Cir. 2017); <u>Wood v. Collier</u>, 836 F.3d 534, 540 (5th Cir. 2016); <u>see also</u> <u>Zink v. Lombardi</u>, 783 F.3d 1089, 1101 (8th Cir. 2015); <u>Gissendaner v. Commissioner, Georgia Dep't of Corrections</u>, 779 F.3d 1275, 1278-79 (11th Cir. 2015).

[10]<u>See</u> Death Penalty Information Center, https://deathpenalty info.org/executions-united-states (last visited August 13, 2018) (listing executions in 2015, 2016, 2017, and 2018).

protocol using midazolam violated the Eighth Amendment. The
Glossip Court emphasized that midazolam has been repeatedly and
successfully used without problems as the first drug in the
three-drug lethal injection protocol. See Glossip, 135 S. Ct. at
2734, 2740-46. Glossip reaffirmed Baze's two-part test and found
that "the prisoners failed to identify a known and available
alternative method of execution that entails a lesser risk of pain"
and also "failed to establish that Oklahoma's use of a massive dose
of midazolam in its execution protocol entails a substantial risk
of severe pain." Id. at 2731.

## B.    The Arkansas Litigation

Since Glossip there has been significant litigation concerning
Arkansas' use of  midazolam.  The litigation that has led to the
case before the court began in April of 2015 when Plaintiffs in
this action challenged the legality of the Arkansas protocol in
state court under the Arkansas Constitution.  The Arkansas Supreme
Court dismissed their claims, Kelley v. Johnson, 2016 Ark. 268
(Ark. 2016), and the United States Supreme Court denied certiorari
on February 21, 2017, Johnson v. Kelley, 137 S. Ct. 1067 (2017).

On February 27, 2017, Governor Asa Hutchinson of Arkansas
scheduled executions for eight death row inmates to occur over a
ten-day period, two occurring per day.[11]  Just three weeks before
the first scheduled execution, Plaintiffs filed a federal lawsuit

_____

[11]Governor Hutchinson ordered the executions because Arkansas'
supply of midazolam had an expiration date of April 30, 2017.

On February 27, 2017, Governor Asa Hutchinson of Arkansas scheduled executions for eight death row inmates to occur over a ten-day period, two occurring per day.[11]  Just three weeks before the first scheduled execution, Plaintiffs filed a federal lawsuit challenging Arkansas' lethal injection protocol.[12]  Nine inmates, including those involved in the instant lawsuit,[13] filed suit under 42 U.S.C. § 1983 alleging that Arkansas' method of execution, by itself and in combination with the compressed execution schedule, violated the Eighth and Fourteenth Amendments.  The focus of the inmates' lawsuit was that the use of midazolam would not render the inmates insensate to the pain caused by the other two drugs in the execution protocol.

The inmate plaintiffs moved for a preliminary injunction. After a four-day evidentiary hearing, on April 15, 2017, the district court granted a preliminary injunction and enjoined the State from carrying out the scheduled executions.

The State appealed.  On April 17, 2017, the Eighth Circuit vacated the injunction.  McGehee v. Hutchinson, 854 F.3d 488, 490

---

[11]     Governor Hutchinson ordered the executions because Arkansas' supply of midazolam had an expiration date of April 30, 2017.

[12]     McGehee v. Hutchinson, 4:17-cv-00179-KGB (E.D. Ark.).

[13]     Since the filing of the § 1983 complaint, plaintiff Jason McGehee was granted clemency.  (Docket Entry No. 1, p. 2, n.1). Eleven other inmates have intervened in the litigation.

challenging Arkansas' lethal injection protocol.[12] Nine inmates, including those involved in the instant lawsuit,[13] filed suit under 42 U.S.C. § 1983 alleging that Arkansas' method of execution, by itself and in combination with the compressed execution schedule, violated the Eighth and Fourteenth Amendments. The focus of the inmates' lawsuit was that the use of midazolam would not render the inmates insensate to the pain caused by the other two drugs in the execution protocol. The inmate plaintiffs moved for a preliminary injunction. After a four-day evidentiary hearing, on April 15, 2017, the district court granted a preliminary injunction and enjoined the State from carrying out the scheduled executions.

On April 17, 2017, the Eighth Circuit vacated the injunction. McGehee v. Hutchinson, 854 F.3d 488, 490 (8th Cir.), cert. denied, 137 S. Ct. 1275 (2017).[14] The Eighth Circuit held that a stay was not necessary because the inmates delayed unreasonably in bringing their § 1983 suit, the district court did not apply the correct legal standard, and the facts did not support the district court's action. Most germane to the matters now before this court, the

---

[12]McGehee v. Hutchinson, 4:17-cv-00179-KGB (E.D. Ark.).

[13]Since the filing of the § 1983 complaint, plaintiff Jason McGehee was granted clemency. (Docket Entry No. 1, p. 5 n.1 [All page numbers for docket entries refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.]) Eleven other inmates have intervened in the litigation.

[14]See also Williams v. Kelley, 854 F.3d 998, 1001-02 (8th Cir.) (describing the McGehee decision), cert. denied, 137 S. Ct. 1284 (2017); Jones v. Kelley, 854 F.3d 1009, 1012 (8th Cir. 2017) (same).

Eighth Circuit held that the inmates failed to demonstrate a "significant possibility of establishing a known and available alternative that would significantly reduce a substantial risk of severe pain." McGehee, 854 F.3d at 493.

The Eighth Circuit held that in order to meet Glossip's requirement that the plaintiff show a feasible, readily implemented alternative execution method, the inmates would not need to show that it was "authorized by statute or ready to use immediately . . . ." McGehee, 854 F.3d at 493. The Eighth Circuit held that "the State must have access to the alternative and be able to carry out the alternative method relatively easily and reasonably quickly." Id. (citing Arthur v. Commissioner, Alabama Dep't of Corrections, 840 F.3d 1268, 1300 (11th Cir. 2016)); see also Jones, 854 F.3d at 1016; Ledford v. Commissioner, Georgia Dept. of Corrections, 856 F.3d 1312, 1319 n.2 (11th Cir.) (observing that the McGehee decision "is not inapposite to [11th Circuit] precedent"), cert. denied. sub nom., Ledford v. Dozier, 137 S. Ct. 2156 (2017).[15] Although the inmates had cited various alternative

---

[15]The Fifth Circuit has not yet extensively discussed the second Baze requirement. In an as-applied challenge arguing that various health concerns would render the use of lethal injection cruel and unusual in an inmate's execution, a court in this district recently found that an alternative was not feasible or readily available when its use would require the alteration of Texas' statutory law or execution protocol. Bible v. Davis, 2018 WL 3068804, at *9 (S.D. Tex. 2018), aff'd, Bible v. Davis, ___ F. App'x ___, 2018 WL 3156840, at *1 (5th Cir. 2018); see also Boyd v. Warden, Holman Correctional Facility, 856 F.3d 853, 869 (11th Cir. 2017) (finding that the inmate did not meet the alternative-
(continued...)

methods of execution, the Eighth Circuit found that "the availability of the several [alternative] methods cited by the district court is too uncertain to satisfy the rigorous standard under the Eighth Amendment." McGehee, 854 F.3d at 493. Specifically, the Eighth Circuit found that "[t]he possibility that Arkansas could acquire pentobarbital for use in executions is too speculative to justify stays of execution. Arkansas made at least three unsuccessful inquiries about obtaining barbiturates in 2015, and the difficulty of obtaining drugs for use in lethal injection is well documented." Id.; see also Jones, 854 F.3d at 1015 (same).

In April of 2017 Arkansas executed four men using the three-drug cocktail that included midazolam. Arkansas has not executed anyone since.

On remand from the Eighth Circuit, Plaintiffs filed an amended complaint that argues, in part, that "[m]ultiple alternative execution methods are feasible, readily available, and would significantly reduce Plaintiffs' suffering."[16] The parties based their lawsuit on the assumption that "pentobarbital is a more humane alternative to Arkansas' current use of midazolam, which has been associated with several executions in which inmates suffered

---

[15](...continued)
method prong because the state could not carry out the inmate's "death sentence by hanging or firing squad without the Alabama legislature fundamentally rewriting its method-of-execution statute").

[16]McGehee v. Hutchinson, 4:2017-cv-179 (E.D. Ark. June 21, 2018), Docket Entry No. 117, p. 11.

prolonged, tortured deaths."[17]  To comply with <u>Baze</u>'s requirement

of showing a feasible, readily implemented alternative to

midazolam, Plaintiffs seek to show in the Arkansas litigation

"whether pentobarbital could be made available to Arkansas for use

in its executions . . . ."[18]  To do so, on February 22, 2018,

Plaintiffs served on TDCJ a subpoena *duces tecum* to produce

documents seeking "discovery from the TDCJ relating to the TDCJ's

knowledge of, and communications with, any supplier of

pentobarbital."[19]  The subpoena specifically sought disclosure of

"when, how, and from whom Texas has secured or attempted to secure

lethal injection drugs, including pentobarbital."[20]  In addition to

the subpoena in this case, it appears that Plaintiffs have served

similar subpoenas on Florida, Missouri, and Nebraska.[21]

On March 7, 2018, Texas served 24 pages of objections.[22]  On

March 28, 2018, TDCJ produced some redacted responsive documents,

but did not disclose key information about its acquisition of

pentobarbital.  Through the meet-and-confer process, Plaintiffs

---

[17]Motion to Compel, Docket Entry No. 1, p. 5.

[18]<u>Id.</u>

[19]<u>Id.</u> at 6.

[20]<u>Id.</u>

[21]<u>McGehee v. Nebraska Dep't of Correctional Services</u>, 4:2018-cv-03092 (Neb.); <u>McGehee v. Florida Dep't of Corrections</u>, 4:2018-mc-00004 (N.D. Fla.); <u>McGehee v. Missouri Dep't of Corrections</u>, 2:2018-mc-04138 (W.D. Mo.).

[22]Objections to Subpoena, Exhibit 2 to Motion to Compel, Docket Entry No. 1-2.

agreed to narrow their request, but still asked for a complete disclosure of pentobarbital sources. Plaintiffs now seek a court order requiring production of

1. All Documents, Communications, and Things arising from or related in any way to Texas's efforts to obtain pentobarbital for use in Executions in Texas, including but not limited to information about Texas's current supply of pentobarbital, when Texas expects to obtain additional pentobarbital, and the source(s) of pentobarbital.

4. All Documents, Communications, and Things Related to any Supplier of pentobarbital, including but not limited to Communications Related to the availability of pentobarbital for use in Executions; Documents; Communications, or Things identifying Suppliers of pentobarbital; Documents, Communications, or Things Related to any Supplier's present, past, or future willingness to supply pentobarbital to any State for use in any Execution.[23]

TDCJ advanced three reasons for refusing to disclose the requested material: "(i) that the subpoenaed items are 'privileged and confidential under Texas law' and would 'likely result in the cessation of executions in Texas, as its supplier may cease supplying Texas'; (ii) that the documents are not relevant to the Arkansas litigation; and (iii) that the subpoena is 'unduly burdensome, overbroad and speculative.'"[24] In response, Plaintiffs promised to maintain the confidentiality of the information through a protective order already in place in the Arkansas litigation.[25]

---

[23]Motion to Compel, Docket No. 1, p. 7.

[24]Id. at 7-8.

[25]Protective Order (Arkansas case), Exhibit 5 to Motion to Compel, Docket Entry No. 1-5, pp. 4-12.

Unsuccessful in their efforts to persuade TDCJ to voluntarily provide the requested material, Plaintiffs have filed suit to compel compliance under FED. R. CIV. P. 45. TDCJ has filed a Motion to Dismiss.[26] The core of TDCJ's arguments are the same as the objections to disclosure: complaints that the subpoena would impose an undue burden, information about Texas' supplier is not relevant to the Arkansas litigation, and the requested information is protected. Plaintiffs have filed a reply arguing that they have complied with federal procedure with regard to the subpoena and that the requested documents are relevant. Plaintiffs also argue that the subpoena is not overbroad and does not create an undue burden for the TDCJ.

## II. Legal Standards

The Federal Rules of Civil Procedure govern the scope of discovery. Rule 26(b) of the Federal Rules of Civil Procedure

---

[26]See Motion to Dismiss, Docket Entry No. 12. TDCJ seeks to quash the subpoena based on various alleged deficiencies in its service and overbreadth in its scope: Plaintiffs improperly served the subpoena on a TDCJ employee, not on TDCJ's custodian of records; the request seeks documents from an unreasonable time range; and Plaintiffs should have provided fees for copying and producing documents with the subpoena. Despite any technical errors in the subpoena and its service, TDCJ received notice of its contents and provided redacted documents to Plaintiffs. Courts have found that defects in service may be cured by receipt or notice to the official recipient. See Armendariz v. Chowaiki, 2015 WL 13373576, at *1 (W.D. Tex. 2015) (citing Winn & Lovett Grocery Co. v. N.L.R.BG., 213 F.2d 785 (5th Cir. 1954)). However, since the court concludes that the subpoena puts an undue burden on TDCJ and that the requested information is not relevant, the court will not address TDCJ's arguments about defects in the subpoena.

states that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ." FED. R. CIV. P. 26(b)(1). Pursuant to Federal Rule of Civil Procedure 45, parties may use subpoenas to command parties or non-parties to "produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control." FED. R. CIV. P. 45(a)(1)(A)(iii).[27] Since compliance is required in this judicial district, this court has jurisdiction over objections pursuant to FED. R. CIV. P. 45(d)(2)(B)(i).

Rule 45(d)(1) emphasizes that "[a] party or attorney responsible for issuing . . . a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." FED. R. CIV. P. 45(d)(1). A court "*must* quash or modify a subpoena that fails to allow a reasonable time to comply; . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies; or subjects a person to undue burden." FED. R. CIV. P. 45(d)(3)(A) (emphasis added); see also Whole Woman's Health v. Smith, ___ F.3d ___, 2018 WL 3421096, at *10 (5th Cir. 2018) (emphasizing that "court 'must' quash a subpoena to avoid 'subject[ing] a person to undue burden'") (quoting FED. R. CIV. P. 45(d)(3)(A)(iii)-(iv)).

---

[27] "[T]he scope of discovery allowed under a subpoena is the same as the scope of discovery allowed under Rule 26." Singletary v. Sterling Transport Co., Inc., 289 F.R.D. 237, 240-41 (E.D. Va. 2012).

Whether a subpoena imposes an undue burden generally raises a question of the subpoena's reasonableness, which "requires a court to balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it." 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2463 (2d ed. 1995). "The moving party has the burden of proof to demonstrate 'that compliance with the subpoena would be "unreasonable and oppressive."'" Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 818 (5th Cir. 2004) (footnote and quotation omitted). Courts decide whether a particular subpoena presents an undue burden by applying a "balancing test," Whole Woman's Health 2018 WL 3421096, at *10, which looks at various factors:

> (1) relevance of the information requested; (2) the need of the party for the [subpoenaed materials]; (3) the breadth of the . . . request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested [materials]; and (6) the burden imposed. Further, if the person to whom the . . . request is made is a non-party, the court may also consider the expense and inconvenience to the non-party.

Wiwa, 392 F.3d at 818; see also Whole Woman's Health, 2018 WL 3421096, at *10.

## III. Analysis

The briefing by the parties has focused on the three reasons TDCJ provided for not disclosing its source for pentobarbital: disclosure would be unduly burdensome, the source of Texas' drugs is not relevant to the Arkansas litigation, and the information is protected by state law. Before turning to those arguments, the

court will discuss two factors that inform whether the subpoena should be quashed. First, the court will discuss the lengths to which Texas has gone to protect the confidentiality of its source of pentobarbital. Second, the court will review relevant decisions in which courts have rejected similar third-party attempts to discover information about a state's source of execution drugs.

## A.  Confidentiality of Texas' Source of Pentobarbital

Since adopting lethal injection in 1982, Texas has conducted several hundred executions. Texas statutory law does not specify what substance will be used in these injections, only that the execution be "by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such convict is dead." See TEX. CODE CRIM. PROC. Ann. art. 43.14. In 2009 Texas changed its execution protocol from a three-drug process to a single dose of pentobarbital. As the sources for execution drugs have dwindled, states have searched for substances to use in executions. Texas began obtaining pentobarbital from compounding pharmacies in September of 2013.

Soon after the switch to compounded pentobarbital, a Public Information Act ("PIA") disclosure revealed that Texas had received its drugs from the Woodlands Compounding Pharmacy. "The revelation prompted what the [pharmacy] owner decried as a 'firestorm' of angry emails, protests, and media coverage that ultimately dissuaded the pharmacy from continuing to supply TDCJ with

-16-

lethal-injection drugs." Tex. Dep't of Crim. Justice v. Levin, 520 S.W.3d 225, 240 (Tex. App. — Austin 2017, pet. ref'd). The owner of the Woodlands Compounding Pharmacy reported receiving death threats. See Whitaker v. Livingston, No. 4:13-cv-2901 (S.D. Tex. June 6, 2016), Docket Entry No. 94, p. 24. The Woodlands Compounding Pharmacy asked Texas to return the pentobarbital it had provided. Texas now receives its compounded pentobarbital from a different supplier.

Concerned about identity of compounding pharmacies, the Texas Legislature in 2015 exempted from PIA disclosure any "identifying information . . . including that of: (1) any person who partici-pates in an execution procedure, including a person who uses, supplies, or administers a substance during the execution; and (2) any person or entity that manufactures, transports, tests, procures, compounds, prescribes, dispenses, or provides a substance or supplies used in an execution." TEX. GOV'T CODE ANN. § 552.1081; see also TEX. CODE CRIM. PROC. Ann. art. 43.14(b).

Litigants in both federal and state court have attempted to discover the source of Texas' lethal injection drugs. Recent state litigation began when attorneys representing death row inmates sought PIA disclosure of information about Texas' source of compounded pentobarbital before the PIA 2015 exemption. In response, TDCJ requested an opinion from the Texas Office of Attorney General regarding whether the PIA required disclosure of

-17-

the identity of the supplying pharmacies.  Relying on the Cox[28]
protection -- a Texas common-law exemption from public disclosure
of information that would pose a substantial threat of physical
harm -- the Texas attorney general opined that TDCJ "must withhold
the identifying information of the pharmacy. . . ."  Texas Attorney
General, OR2014-09184, at 2-3.  The death row inmates' attorneys
then brought suit in state court.

An intermediate state appellate court found that the Cox
protection did not preclude disclosure of compounding pharmacy's
identity because testimony did not show a "substantial risk" of
physical harm to those affiliated with the pharmacy.  See Levin,
520 S.W.3d at 240.  Levin is pending before the Texas Supreme
Court.  Texas Dep't Criminal Justice v. Levin, No. 17-0552 (Tex.
July 18, 2018) (motion for rehearing filed).

Inmates have unsuccessfully attempted to obtain disclosure of
Texas' supplier through federal litigation.  Texas has revealed
some information about its execution drugs, "opposes disclosure,
even under seal, of the identity of either the compounding pharmacy
that produced the drug or the testing facility that evaluated its
potency and purity."  Campbell v. Livingston, 2014 WL 12493215, at
*1 (S.D. Tex. 2014).

Courts in the Fifth Circuit have consistently denied requests
for disclosure of information about the compounding pharmacy

---

[28]Texas Dep't of Public Safety v. Cox Texas Newspapers, L.P.,
343 S.W.3d 112, 116-18 (Tex. 2011).

providing the pentobarbital.  See Trottie v. Livingston, 766 F.3d 450, 453 (5th Cir. 2014); Sells v. Livingston, 750 F.3d 478, 480 (5th Cir. 2014); Whitaker v. Livingston, 732 F.3d 465 (5th Cir. 2013); Campbell, 2014 WL 12493215, at *1.  In particular, the Fifth Circuit has held that the due process clause did not require disclosure of that information.  See id.; see also Sepulvado v. Jindal, 729 F.3d 413, 418-19 (5th Cir. 2013).  The Arkansas inmates are thus requesting information that has been denied Texas inmates: information about the source of the drugs used in Texas executions.[29]

**B.    Subpoenas to Disclose Identity of Pentobarbital Suppliers in Other States**

This is not the first case in which inmates have filed third-party subpoenas seeking to discover the source of execution drugs. The litigation in this case is similar to cases arising out of a legal challenge to Mississippi's execution protocol.[30]  In addition to seeking information from Mississippi itself, the plaintiffs in

---

[29]Texas has not only refused to disclose the source of its pentobarbital through litigation, it has generally refused to share its supply of pentobarbital with other states.  See In re Ohio Execution Protocol, 860 F.3d 881, 891 (6th Cir. 2017) ("Ohio itself contacted the departments of correction in Texas, Missouri, Georgia, Virginia, Alabama, Arizona, and Florida to ask whether they would be willing to share their supplies of pentobarbital. All refused."  Texas, however, provided Virginia with three vials of compounded pentobarbital for an execution in 2015.  See Virginia Department of Corrections v. Jordan, 2017 WL 5075252, at *12 (E.D. Va. 2017); Price v. Dunn, 2017 WL 1013302, at *2 (S.D. Ala. 2017); Prieto v. Clarke, 2015 WL 5793903, at *2 (E.D. Va. 2015).

[30]Jordan v. Fisher, 3:15-CV-295-HTW-LRA (S.D. Miss.).

that action served third-party subpoenas on Virginia, Missouri, and Georgia. None of those subpoenas resulted in disclosure of an execution-drug supplier's identity. See Virginia Dep't of Corrections v. Jordan, 2017 WL 5075252, at \*17 (E.D. Va. 2017) ("The Circuit Courts concur that requiring disclosure of suppliers of lethal injection chemicals and team members imposes an undue burden on states.") (citing cases).

When the Mississippi plaintiffs served a third-party subpoena for documents regarding Missouri's use of pentobarbital in lethal injections, the supplier provided an anonymous declaration confirming that it would cease to provide the drug should its identity be disclosed. The Eighth Circuit held that "because [the anonymous pharmacy] would not supply pentobarbital to Mississippi once its identity is disclosed, we conclude that [its] identity has no relevance to the inmates' Eighth Amendment claim." In re Missouri Dep't of Corrections, 839 F.3d 732, 736 (8th Cir. 2016), cert. denied sub nom. Jordan v. Missouri Dep't of Corrections, 137 S. Ct. 2180 (2017). Even if the supplier's identity were relevant, the Eighth Circuit held that the subpoena created an undue burden because (1) it would make it more difficult for Missouri to acquire the necessary drugs and (2) the pharmacy's identity had "little, if any, relevance to their Eighth Amendment claim" in the Mississippi lawsuit. Id. at 736.

The Virginia and Georgia lawsuits provided additional reasons for quashing third-party subpoenas. A federal district court in

Virginia quashed the third-party subpoena for information about that state's supplier of midazolam because it would be unduly burdensome for the state to comply. The court found undue hardship because "Virginia's ability to secure the drugs necessary to carry out lethal injections would be jeopardized, if not totally frustrated, should the supplier of those drugs be disclosed." Jordan, 2017 WL 5075252, at *19. The lawsuit in Georgia found that the state's Lethal Injection Secrecy Statute and prior case law protected against disclosure of the information. The district court concluded, "where Georgia's own death row prisoners have been flatly denied access to information covered by Georgia's Lethal Injection Secrecy Act, it similarly bars . . . efforts to secure the same type of information via subpoena for use in [the] Mississippi case." Georgia Dep't of Corrections v. Jordan, 2016 WL 9776069, at *3 (N.D. Ga. 2016); see also Jordan, 2017 WL 5075252, at *19 (E.D. Va. 2017) (finding that a similar secrecy statute did not create a privilege but was an "'add-on' to the reasons counseling against disclosure").

Courts have also held that a protective order would not be sufficient to conceal the pharmacy's identity because "'it is likely that active investigation of the physician, pharmacy, and laboratory will lead to further disclosure of the identities.'" In re Missouri Dep't of Corrections, 839 F.3d at 736 (quoting In re Lombardi, 741 F.3d 888, 894 (8th Cir. 2014)); see also Jordan, 2017 WL 5075252, at *21 ("In nearly identical contexts, other courts

have observed that such protective orders are not adequate to protect a state's interest in shielding the identities of individuals and entities that assist the state in carrying out executions."); In re Ohio Execution Protocol Litig., 845 F.3d at 238-39 (6th Cir. 2016) (observing that "the district court did not err in rejecting Plaintiffs' request to designate certain information subject to the protective order as 'attorney's eyes only'").

Plaintiffs in this action issued subpoenas to states that were not parties to the Mississippi litigation (including Florida, Missouri, and Nebraska).[31] As in the instant case, those states refused to disclose material identifying the supplier of their drugs, and plaintiffs are litigating the matter in federal court. It does not appear that the courts in those actions have ruled on the motions to compel.

## C. The Burden Imposed by the Subpoena

The court "must quash" a subpoena that "subjects a person to undue burden." FED. R. CIV. P. 45(d)(3)(A)(iv) (emphasis added). Plaintiffs argue that "[t]he only potential burden identified by the TDCJ is speculative:  the TDCJ contends that it may lose its pentobarbital supplier if required to produce documents for use in the Arkansas litigation."[32]  This burden, however, is not

---

[31]McGehee v. Nebraska Dep't of Correctional Services, 4:2018-cv-03092 (Neb.); McGehee v. Florida Dep't of Corrections, 4:2018-mc-00004 (N.D. Fla.); McGehee v. Missouri Dep't of Corrections, 2:2018-mc-04138 (W.D. Mo.).

[32]Motion to Compel, Docket Entry No. 1, pp. 10-11.

speculative or insignificant. The Supreme Court has recognized that disclosing the source of lethal injection drugs creates a "practical obstacle" for states because suppliers have been pressured into withholding chemicals from states. Glossip, 135 S. Ct. at 2733. Texas already lost a supplier of compounded pentobarbital after the PIA disclosure in 2013. TDCJ has provided affirmative, credible evidence that its fear of losing the means to conduct executions is not speculative.

In other litigation TDCJ has disclosed that it obtains pentobarbital from a licensed Texas compounding pharmacy. See Levin, 520 S.W.3d at 226. That pharmacy, under the pseudonym Pharmacy X, has provided a declaration in the instant action.[33] Pharmacy X says that it will stop supplying TDCJ with lethal injection chemicals should its identity be disclosed. Pharmacy X based its decision to supply TDCJ with drugs on its "identity remaining secret."[34] Because of "documentary evidence of threats, harassment, and boycotts to which other suppliers of lethal injection drugs have been subjected as a result of their lawful decision to supply state correctional departments with drugs needed to carry out executions," Pharmacy X "reasonably fears that if its identity is disclosed or revealed, anti-death penalty advocates will harass and retaliate against Pharmacy X, resulting in physical

---

[33]Declaration of Pharmacy X, Exhibit 4 to Motion to Dismiss, Docket Entry No. 12-4. Plaintiffs do not object to the declaration and do not challenge its credibility.

[34]Id. at 2 ¶ 4.

and financial harm to Pharmacy X, its owner(s), and its employees."[35] Accordingly, "[i]f Pharmacy X's identity is disclosed or revealed, Pharmacy X will no longer conduct business with the [TDCJ]."[36]

Plaintiffs dispute Pharmacy X's fears that disclosure would lead to threats, harassment, and boycotts. Plaintiffs assert that the recent Texas state case seeking disclosure of Texas' supplier before 2015 "rejected the argument that a purported threat of physical harm to that pharmacy was a basis to withhold its identity, finding instead that any such threat was 'mere speculation.'"[37] The Levin case, however, is not final in state court, and is thus of limited relevance. Nevertheless, the Levin lawsuit involved Texas' Cox protection against a "substantial threat of physical harm." The Levin court found that the state had only demonstrated "the residual or general threat of physical harm that would accompany virtually any participation in governmental functions or controversial issues." Levin, 520 S.W.3d at 240. Relying on Levin, Plaintiffs argue that "Pharmacy X's unadorned assertion that it fears threats is nothing more than 'mere speculation.'"[38]

---

[35]Id. at 3 ¶ 7 and 2 ¶ 6.

[36]Id. at 2 ¶ 4.

[37]Answering Brief, Docket Entry No. 14, p. 14 (citing Levin, 520 S.W.3d at 240).

[38]Id.

TDCJ has not disclosed whether or not Pharmacy X was the subject of the lawsuit in Levin. More importantly, the state-law protection at issue in Levin is not the issue before this court. Whether or not compounding pharmacies have valid fears of a substantial threat is not the point. Pharmacy X unequivocally indicates that it will cease supplying Texas with pentobarbital upon disclosure. Pharmacy X's perception that physical, financial, or social threats exist would shut off TDCJ's access to compounded pentobarbital.

Past history has shown that Pharmacy X's concerns are not unfounded. After the 2013 disclosure involving the Woodlands Compounding Pharmacy, pressure, intimidation, and threats resulted in the source of Texas' compounded pentobarbital demanding the return of its drugs. With that history, and Pharmacy X's Declaration, TDCJ persuasively argues that "[s]hould TDCJ be forced to disclose, the relationship with the 'pharmacists involved' would be destroyed and Plaintiffs, through a discovery request, will have closed off an avenue of lawful punishment in all of Texas."[39]

Plaintiffs seek disclosure not only of Texas' current supplier, but of all information relating to past and possible future suppliers, as well as what efforts TDCJ has made to find suppliers. Aside from the overly expansive breadth of the request, TDCJ persuasively argues that disclosure would also likely impede

---

[39]Reply to Answering Brief, Docket Entry No. 15, p. 4.

additional sources from agreeing to supply Texas with pentobarbital. Pharmacy X's Declaration amply shows the chilling effect that possible disclosure has on all potential sources of execution chemicals.

The court concludes that TDCJ has shown that full compliance with the subpoena would create an undue burden.

## D.  Relevance

TDCJ also argues that the material requested by the subpoena is not relevant to the ongoing Arkansas litigation. "'Under the federal discovery rules, any party to a civil action is entitled to all information relevant to the subject matter of the action before the court unless such information is privileged.'" <u>Wiwa</u>, 392 F.3d at 820. The relevance of the material is directly related to the showing Plaintiffs must make to prove their Eight Amendment claim in the Arkansas litigation. Plaintiffs must show the Arkansas court that there exists a "feasible, readily implemented" alternative to midazolam that would "significantly reduce a substantial risk of severe pain." <u>Baze</u>, 128 S. Ct. at 1532. The Eighth Circuit has held that the <u>Baze</u> standard requires Plaintiffs to show that the State has "access to the alternative and [is] able to carry out the alternative method relatively easily and reasonably quickly." <u>McGehee</u>, 854 F.3d at 493; <u>see also</u> <u>Jones</u>, 854 F.3d at 1015.

TDCJ argues that the material relating to the source of its pentobarbital is not relevant because its supplier will not provide

drugs to Arkansas. Pharmacy X has confirmed that it "will not supply lethal injection chemicals to any state other than Texas under any circumstances."[40] The Eighth Circuit has found that information about a pharmacy's identity is not relevant if the pharmacy would not provide lethal injection chemicals to another state. See In re Mo. Dep't of Corr., 839 F.3d at 736 ("Therefore, because [the pharmacy] would not supply pentobarbital to Mississippi once its identity is disclosed, we conclude that [its] identity has no relevance to the inmates' Eighth Amendment claim."). Thus, the identity of the supplier of pentobarbital to Texas would not provide Plaintiffs with relevant information about an "available alternative" to advance the Arkansas litigation.

Moreover, even if Pharmacy X's identity had some relevance as a supplier of pentobarbital to Texas, that relevance is contingent on Pharmacy X being a readily available source of pentobarbital. Pharmacy X has stated that it would cease providing Texas with compounded pentobarbital should its identity be disclosed. On disclosure, information about Texas' supplier would cease to be relevant — Pharmacy X would no longer supply Texas with the drugs.

Plaintiffs argue that, regardless of Pharmacy X's unwillingness to provide Arkansas the drugs, they should be able "to further explore facts regarding how that supplier either obtains or makes pentobarbital."[41] Plaintiffs, however, do not

_____

[40]Declaration of Pharmacy X, Exhibit 4 to Motion to Dismiss, Docket Entry No. 12-4, p. 2 ¶ 5.

[41]Answering Brief, Docket Entry No. 14, p. 11 n.5.

explain how that information would make pentobarbital a feasible, readily available alternative without a supplier willing to provide Arkansas with the compounded drugs. Likewise, the broader discovery sought by Plaintiffs about Texas' efforts to find "present, past, or future"[42] suppliers of pentobarbital is not relevant to the Arkansas litigation. The identity of such suppliers would not provide Plaintiffs with information about sources that are readily available to Arkansas, especially since that information is equally available to Plaintiffs.

The court concludes that the subpoena requests information that is not relevant to the Arkansas litigation.

## E.   Privilege

TDCJ argues that the subpoena requests privileged information. "Under the federal discovery rules, any party to a civil action is entitled to all information relevant to the subject matter of the action before the court unless such information is privileged." Wehling v. Columbia Broadcasting System, 608 F.2d 1084, 1086 (5th Cir. 1979). Relying primarily on the laws Texas created in 2015 to prevent disclosure under the PIA of its execution procedure, TDCJ argues that "[s]uch records are privileged and confidential."[43] Plaintiffs respond that the statutory provisions only exempt

---

[42]Motion to Compel, Docket Entry No. 1, p. 7.

[43]Motion to Dismiss, Docket Entry No. 12, p. 31.

disclosure under Texas' PIA, which itself does not intend to "create new privileges from discovery." TEX. GOV'T CODE 552.005(b).

On their face the statutes on which TDCJ relies only preclude disclosure under Texas' PIA. Some federal courts considering the disclosure of similar information under state confidentiality statutes have been hesitant to "federalize the [state] secrecy law as a common-law privilege for immunity." In re Ohio Execution Protocol Litigation, 845 F.3d at 239; see also Jordan, 2017 WL 5075252, at *19. Given the court's other conclusions it is not necessary to decide whether Texas' secrecy statute creates a privilege in federal court.

The court, however, cannot ignore the intent behind the statutory exemption from disclosure under the PIA. TDCJ persuasively argues that "TDCJ's concerns are not only its own, but that of the Texas people." While not a dispositive factor, the Texas statute exhibits a democratically manifested intent not to disclose the source of Texas' lethal injection drugs. The Motion to Compel must be viewed against a backdrop of extensive litigation brought by Texas inmates, often arguing for disclosure under various constitutional theories. The Fifth Circuit has consistently held that Texas inmates do not have a right to information about Texas' supplier. The Arkansas plaintiffs seek by subpoena information unavailable to Texas prisoners. While not a matter of privilege, denying the Motion to Compel harmonizes with the Fifth Circuit law precluding disclosure.

-29-

## F. Protective Order

Plaintiffs argue that a protective order would remedy TDCJ's concerns about any disclosure pursuant to the subpoena. A "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1). In analyzing a request for a protective order, the court "must compare the hardship to the party against whom discovery is sought against the probative value of the information to the other party." Cazorla v. Koch Foods of Mississippi, L.L.C., 838 F.3d 540, 555 (5th Cir. 2016) (internal quotation marks omitted). "District courts have broad discretion in determining whether to grant a motion for a protective order." In re LeBlanc, 559 F. App'x 389, 392-93 (5th Cir. 2014).

A protective order is already in place in the Arkansas litigation.[44] The protective order provides that Plaintiffs could divulge confidential material to counsel of record, attorneys employed in the same office as counsel, any expert witnesses, up to ten staff members including secretaries and legal assistants, court personnel, and anyone else whom the parties agree should have access.[45] Inadvertent disclosure of confidential information would require Plaintiffs to give immediate notice, to advise the compounding pharmacies of the disclosure, and to take reasonable

---

[44]See Protective Order, Exhibit 5 to Motion to Compel, Docket Entry No. 1-5, pp. 4-12.

[45]See id. at 8-9 ¶ 9.

steps to return the disclosed material.[46]  Plaintiffs state that they would agree to a supplemental protective order if the one in place is deficient.

TDCJ expresses concern about the protective order on several grounds:  The Arkansas district court could unseal the information, which would result in disclosure; intervention of parties into the Arkansas lawsuit could result in weakening of the protective order; the number of people involved in the protective order could result in intentional or accidental disclosure; the protective order is "meaningless" because of inadequate remedial action; and accidental disclosure of the information is a foreseeable possibility.[47]  Most persuasively, TDCJ argues that the disclosure of information about its supplier of pentobarbital, even with the protective order in place, would end their ability to procure compounded pentobarbital.

The court agrees with the analysis of another district court denying a similar motion to compel production information about the supplier of Mississippi's lethal injection chemicals:

> Entry of a protective order merely limiting the dissemination of information is an unsatisfactory alternative, as the drug supplier has made it clear that it will discontinue selling the necessary drugs if its identity is revealed.  There is no allowance for revelation by court order. Moreover, the inherent danger and hardship that would follow even an inadvertent disclosure convince the Court that it must protect the information at issue from discovery.  For these reasons, the Defendants are entitled to withhold from discovery

---

[46]See id. at 9-10.

[47]Reply to Answering Brief, Docket Entry No. 15, pp. 9-12.

> any material that would identify suppliers of lethal injection drugs or persons involved in the execution process.

*Jordan v. Hall*, 2018 WL 1546632, at *11 (S.D. Miss. 2018); see also *In re Missouri Dep't of Corrections*, 839 F.3d at 737 (refusing to require disclosure under a protective order because "'it is likely that active investigation of the physician, pharmacy, and laboratory will lead to further disclosure of the identities'"); *Jordan*, 2017 WL 5075252, at *21 ("[S]uch protective orders are not adequate to protect a state's interest in shielding the identities of individuals and entities that assist the state in carrying out executions."). Because disclosure of the requested information would cause Texas' supplier to stop providing compounded pentobarbital, and real concerns exist about the possibility of inadvertent disclosure, the court concludes that a protective order does not ameliorate TDCJ's hardship if compelled to comply with the subpoena.

## IV. Conclusion and Order

The court has reviewed the arguments and the applicable law and is of the opinion that, on balance, the hardship to TDCJ, particularly in preventing it from obtaining lethal execution drugs, outweighs Plaintiffs' need for this information. Compelling compliance with the subpoena would create an undue burden for TDCJ. Furthermore, Plaintiffs seek information that is not relevant to their underlying lawsuit. The Arkansas plaintiffs have not shown

-32-

that they are entitled to discovery that has been consistently denied to Texas inmates.

Accordingly, the court **DENIES** Plaintiffs' Motion to Compel Compliance with Subpoena (Docket Entry No. 1). The court **GRANTS** TDCJ's Dispositive Motion to Dismiss Plaintiffs' Motion to Compel Compliance with Subpoena (Docket Entry No. 12) to the extent that it will not require compliance with the subpoena. The court **QUASHES** the subpoena at issue in this action. Because the court has ruled on all pending motions, it will dismiss this action with prejudice.

**SIGNED** at Houston, Texas, on this 21st day of August, 2018.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE